## PLANNED INDUSTRIAL EXPANSION AUTHORITY OF KANSAS CITY, Appellant,

v.

## IVANHOE NEIGHBORHOOD COUNCIL and Brown–Caldwell Christian School, Respondents.

### No. WD 70655.

Missouri Court of Appeals, Western District.

April 27, 2010.

As Modified June 1, 2010.

Application for Transfer Denied Aug. 31, 2010.

William E. Quirk, Daniel R. Zmijewski and Anthony W. Bonuchi, Kansas City, MO, for Appellant.

Allison Bergman, Patrick L. Kenney and Michele P. Gellis, Kansas City, MO, for Respondent Ivanhoe Neighborhood Council.

Sherwin L. Epstein and Allen T. Zugelter, Overland Park, KS, for Respondent Brown–Caldwell Christian School.

Before Division III: JAMES EDWARD WELSH, Presiding Judge, and MARK D. PFEIFFER and KAREN KING MITCHELL, Judges.

KAREN KING MITCHELL, Judge.

This is a condemnation action in which the trial court found that Appellant Planned Industrial Expansion Authority of Kansas City ("Expansion Authority") failed to fulfill its statutory obligations to conduct good faith negotiations with the owners of certain property that the Expansion Authority sought to condemn. We affirm and remand for a determination of appropriate attorneys' fees.

## Facts and Procedural Background

The Expansion Authority is a statutory agency that was created by a vote of the City Council of Kansas City, Missouri ("the City") under section 100.320.[1] In 2004, the Expansion Authority prepared a redevelopment plan for the Ivanhoe Gardens Redevelopment Area ("Ivanhoe Gardens") in Kansas City, Missouri. Under section 100.420, the Expansion Authority was authorized to "exercise the power of eminent domain in the manner and under the procedure provided for corporations in chapter 523, RSMo."

Before a city's expansion authority may exercise the power of eminent domain, it is required to go through good faith negotiations with the owners of the properties sought to be acquired. § 523.256. Good faith negotiations include, among other things, submitting an offer to the owners of the properties pursuant to section 523.253. *Id.* The offer must include either an appraisal conducted by licensed appraisers who used generally accepted appraisal practices or an explanation with supporting financial data for the expansion authority's determination of the value of the property. § 523.253.2. In addition, an expansion authority is required to give the "existing merchants, residents, and present businesses ... the first option to redevelop the area." § 100.310(9).

The Expansion Authority's development plan contemplated acquiring the properties that make up Ivanhoe Gardens. This appeal concerns two tracts of land that are located in Ivanhoe Gardens: 2008 East 39th Street, where the Horace Mann School building sits ("school lot"), and 3820 Garfield, which is a small empty lot ("empty lot"). The school building, which is the centerpiece of the redevelopment plan, has been abandoned since the 1980's. At the time the Expansion Authority drafted its development plan, the school lot was

---

1. All statutory references are to RSMo 2000, as updated though the 2009 cumulative supplement.

owned by Brown–Caldwell Christian School ("Brown–Caldwell"). The Expansion Authority's development plan sought to convert the building and the surrounding properties into approximately eighty units of single– and multi-family housing.

The Expansion Authority submitted its general development plan to the City as it was required to do under section 100.400. In December 2004, the City approved the Expansion Authority's general development plan.

In July 2007, the Expansion Authority published notice of the development plan and requested bids to redevelop Ivanhoe Gardens. The Expansion Authority received proposals from three entities— Ivanhoe Neighborhood Council ("Ivanhoe"), Swope Community Builders, and Prairie Dog Development LLC ("Prairie Dog"). Swope Community Builders abandoned its bid, leaving only the proposals of Ivanhoe and Prairie Dog. Ivanhoe is a nonprofit corporation that represents the interests of members of the community who would be affected by the redevelopment of Ivanhoe Gardens. One of its purposes is to coordinate and combine the resources of its members to accomplish what a single resident or a single merchant could not accomplish on its own.

While the Expansion Authority was considering the redevelopment proposals, Ivanhoe offered to purchase Ivanhoe Gardens from Brown–Caldwell for $650,000.

On February 1, 2008, the Expansion Authority accepted Prairie Dog's proposal and notified the City of the Expansion Authority's intent to enter into a development contract with Prairie Dog. At the time the Expansion Authority approved Prairie Dog's proposal, both tracts of land were still owned by Brown–Caldwell. The Expansion Authority accepted Prairie Dog's proposal, purportedly "based on their responsiveness to the proposal, their extensive experience in the development of this type of project, and their financial wherewithal to get the project accomplished."

Even though its proposal had been rejected, Ivanhoe continued its efforts to purchase Ivanhoe Gardens. On April 16, 2008, it entered into an agreement to purchase the school building for $650,000 and the empty lot for $10.

On April 29, 2008, the Expansion Authority notified Ivanhoe and Brown–Caldwell of its intent to file a condemnation petition to obtain the school lot and the empty lot if the parties could not agree on a purchase price. That letter explained that the parties were entitled to their own counsel, to make a counteroffer and engage in further negotiations, to obtain their own appraisal, and to have just compensation for the condemned property determined by a court-appointed panel of condemnation commissioners. Thirty days later, on May 30, 2008, the Expansion Authority submitted a written offer to purchase the school building and the empty lot for $180,400.

The Expansion Authority attached to its letter appraisals of the properties that formed the basis of its offer. The letter also stated that its offer was unconditional and would be open for thirty days, after which condemnation proceedings would be instituted. Neither Ivanhoe nor Brown–Caldwell made a counteroffer or engaged in any negotiations.

On July 11, 2008, the Expansion Authority filed its condemnation petition. It named both Ivanhoe and Brown–Caldwell as defendants. Ivanhoe and Brown–Caldwell opposed the Expansion Authority's petition. Ivanhoe and Brown–Caldwell moved to dismiss the petition on the ground that the Expansion Authority had not fulfilled its statutory obligation to ne-

gotiate in good faith, in that the appraisals the Expansion Authority included in its offer were not made using generally accepted appraisal procedures. Ivanhoe also moved to dismiss on the ground that it had a statutory "first option" to redevelop Ivanhoe Gardens, which the Expansion Authority had not honored.

Among the issues at the hearing was the credibility of the appraisals that the Expansion Authority submitted to Ivanhoe along with its offer. The Expansion Authority's appraisals valued the school lot at $180,000 and the empty lot at $400. The Expansion Authority used two appraisers: B.E. appraised the empty lot, and M.W. appraised the school lot. Both B.E. and M.W. were licensed appraisers.

After hearing the testimony of the appraisers, the circuit court concluded as follows:

> [T]he appraisals provided fell short of a good faith appraisal, despite their *attempt* to comply with generally accepted appraisal practices. The testimony of the appraisers told a different story, bringing into question their motive for a low appraisal value by their inability to explain various items in their reports, including, but not limited to, the drastic adjustments made of comparable properties, the date and type of sale of comparable properties, and the failure to talk to the owner much less consider the recent sale of the property in question.

(Emphasis added.)

The appraisers made certain adjustments to the comparable sale prices of other properties that they used to determine the value for Ivanhoe Gardens. M.W. made substantial adjustments to the sale prices of all of the comparable sales he reviewed. In doing so, he concluded that Ivanhoe Gardens was substantially less valuable than all of the comparable sales. As noted, the trial court found that the appraisers demonstrated "an inability to explain" these "drastic adjustments" resulting in a devaluated appraisal of Ivanhoe Gardens.

In finding that the appraisals provided fell short of the good faith standard, the circuit court also relied on the date and types of comparable sales that the appraisers used when making comparisons to Ivanhoe Gardens. The appraisers did not account for the passage of time between the dates of certain of their comparable sales and the date of their appraisal of Ivanhoe Gardens. For example, B.E. testified that market conditions can change with the passage of time, yet, in some cases, she made no effort to make adjustments for such changes and did not explain why she had not made the adjustments. Likewise, M.W. did not make any adjustments for the passage of time, even though one of his comparable sales was nearly a decade old.

The appraisers also failed to account for the type of sales that occurred with respect to their comparable properties. For example, B.E. relied on "comparable sales" that were, in fact, not traditional sales, but rather foreclosure auctions, which are known to yield lower prices than traditional sales yield.

Further, the circuit court found that in appraising the fair market value of Ivanhoe Gardens, the Expansion Authority's appraisers did not take into account the recent sale of Ivanhoe Gardens from Brown–Caldwell to Ivanhoe at a purchase price of $650,000. Ivanhoe and Brown–Caldwell presented evidence that the sale was an arms-length transaction, and the appraisers did not explain why they failed to account for the recent sale of Ivanhoe Gardens.

The circuit court also found that the Expansion Authority violated section

100.310(9) in that it failed to provide Ivanhoe, which the court found to qualify as a "present business" under the statute, with the "first option" to develop Ivanhoe Gardens, in that the Expansion Authority rejected Ivanhoe's proposal in favor of Prairie Dog's.

The circuit court dismissed the Expansion Authority's condemnation petition on two independent, alternative grounds: (1) the Expansion Authority failed to satisfy the "good faith negotiations" requirement of section 523.256, and (2) the Expansion Authority failed to grant Ivanhoe its statutory right to a "first option" to redevelop the properties. Because the petition was dismissed, the court also awarded attorneys' fees and costs to both Ivanhoe and Brown–Caldwell. *See* § 523.256.

This appeal follows.

### Standard of Review

■ "Before a court may enter an order of condemnation, the court *shall* find that the condemning authority engaged in good faith negotiations prior to filing the condemnation petition." § 523.256 (emphasis added).

Appellate courts have twice addressed a trial court's determination of good faith under this statute, which was enacted in 2006. In *City of Richmond Heights v. Waite*, 280 S.W.3d 770, 774 (Mo.App. E.D. 2009), the Eastern District of this court applied a *de novo* standard of review when the circuit court's determination of good faith turned on a question of law, such as statutory interpretation. However, when the circuit court's determination of good faith turned on a question of fact, this court stated that it would affirm the circuit court's judgment if there was substantial evidence to support it. *City of Kansas City v. Chung Hoe Ku*, 282 S.W.3d 23, 27 (Mo.App. W.D.2009).

A circuit court's determination of whether the good faith requirements of section 523.256 were met is no different from the proceedings in any other court-tried case. Accordingly, we will apply the standard announced in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), which the courts in *Waite* and *Ku* essentially applied without explicitly citing that standard. *Waite*, 280 S.W.3d at 780 (reversing because the trial court erroneously declared and applied the law); *Ku*, 282 S.W.3d at 33 (affirming because there was substantial evidence to support the trial court's findings of fact). In reviewing the circuit court's determination made pursuant to section 523.256, "the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy*, 536 S.W.2d at 32.

### Discussion

The Expansion Authority argues that the circuit court erred in dismissing its condemnation petition for failure to comply with the "good faith negotiations" requirements of section 523.256. We disagree.

As noted above, section 523.256 mandates that a condemning authority enter into good faith negotiations with the owners of the property sought to be condemned. Further, the statute outlines what is to be deemed "good faith":

A condemning authority shall be deemed to have engaged in good faith negotiations if:

(1) It has properly and timely given all notices to owners required by this chapter;

(2) Its offer under section 523.253 was no lower than the amount reflected in an appraisal performed by a state-

licensed or state-certified appraiser for the condemning authority, provided an appraisal is given to the owner pursuant to subsection 2 of section 523.253 or, in other cases, the offer is no lower than the amount provided in the basis for its determination of the value of the property as provided to the owner under subsection 2 of section 523.253;

(3) The owner has been given an opportunity to obtain his or her own appraisal from a state-licensed or state-certified appraiser of his or her choice; and

(4) Where applicable, it has considered an alternate location suggested by the owner under section 523.265.

§ 523.256. The only "good faith" requirement at issue in this appeal is subsection (2) of section 523.256, the good faith offer.

Under section 523.253, which section 523.256 incorporates in subsection (2), a condemning authority must submit an offer to the owners of the property to be condemned and, along with the offer, it must submit, among other things, an appraisal of the property to be condemned or an explanation with supporting financial data for its determination of the value of the property. § 523.253.2. In this case, the Expansion Authority attempted to comply with § 523.253.2 by submitting an appraisal along with its offer. In such cases, the appraisal must be "made by a state-licensed or state-certified appraiser using generally accepted appraisal practices." § 523.253.2(2).

If the requirements of section 523.253 are not met, then the petition for condemnation must be dismissed. *Waite,* 280 S.W.3d at 779. Under section 523.256, the circuit court was required to dismiss the petition for condemnation upon finding that the Expansion Authority did not enter into good faith negotiations with the property owners. The issue here is whether the circuit court erred in finding that the Expansion Authority failed to fulfill the prerequisite to good faith negotiations, the making of an offer that meets the requirements of section 523.253, which, in this case, includes that an appraisal, *made using generally accepted appraisal practices,* be sent to the property owners along with the Expansion Authority's purchase offer.

The circuit court found that:

the appraisals provided fell short of a good faith appraisal, despite their attempt to comply with generally accepted appraisal practices. The testimony of the appraisers told a different story, bringing into question their motive for a low appraisal value by their inability to explain various items in their reports, including, but not limited to, the drastic adjustments made of comparable properties, the date and type of sale of comparable properties, and the failure to talk to the owner much less consider the recent sale of the property in question.

Perhaps wishing to avoid the more deferential standard of review we apply to the circuit court's findings of fact, the Expansion Authority does not argue that the circuit court erred in finding that the appraisals did not meet the standard of a "good faith appraisal." Rather, it argues that the circuit court *lacked the authority* to determine the credibility of the Expansion Authority's appraisals in a proceeding based on section 523.256. According to the Expansion Authority, "the question before the court at this stage [was] not whether there was a 'good faith appraisal,' but solely whether the appraisals were performed by a state-licensed or state-certified appraiser using 'generally accepted appraisal practices.'" The Expansion Authority argues in its Reply brief that the circuit court *conceded* that the appraisals were made using a generally accepted

appraisal practice—the comparables sales approach. However, at oral argument, the Expansion Authority stated that the trial court "essentially concluded as a matter of law" that the appraisers *did not* use generally accepted appraisal practices. We understand the Expansion Authority's position to be that the circuit court found that a generally accepted appraisal method—the comparable sales approach—was used but that the appraisers did not use that method in good faith.

The Expansion Authority's argument fails because, contrary to its argument: (1) the circuit court *did* find that the appraisals were not made using generally accepted appraisal practices, and (2) the circuit court did not exceed its authority in allowing the appraisers to be cross-examined on their claim that they used generally accepted appraisal practices.

**1. The circuit court found that the appraisers did not use generally accepted appraisal practices.**

■ The circuit court found that the appraisals did not meet section 523.253's requirement of being made "using generally accepted appraisal practices." The circuit court found that, *despite* the appraisers' *attempts* to use generally accepted appraisal practices, the "testimony of the appraisers *told a different story.*" (Emphasis added.) The clear meaning of the court's finding was that the appraisers did not follow generally accepted appraisal practices, i.e., that the appraisers' testimony on cross-examination contradicted their testimony on direct examination that they used generally accepted appraisal practices. Moreover, the Expansion Authority's argument on this point implies that it is possible for an appraisal to fall "short of a good faith appraisal" while still meeting the standard of "generally accepted appraisal practices." The Expansion Authority has cited no authority for the

proposition that it is a "generally accepted appraisal practice" to submit an appraisal *in less than good faith,* and we would reject that proposition in any case. Since the court clearly found the appraisals "fell short of a good faith appraisal," it follows that the court found that the appraisals did not meet the standard of "generally accepted appraisal practices." Therefore we reject the Expansion Authority's argument that the circuit court conceded that the appraisers used a "generally accepted appraisal practice." The court did not so concede and in fact found the contrary.

**2. The circuit court did not exceed its authority in considering cross-examination testimony that tended to show that the appraisers did not use generally accepted appraisal practices.**

■ The Expansion Authority argues that the cross-examination of the appraisers was inappropriate and/or irrelevant. According to the Expansion Authority, it met its burden when the appraisers testified that they used generally accepted appraisal practices, and the circuit court lacked the authority to explore the appraisers' credibility at the hearing. We disagree.

The Expansion Authority bases its argument on this point largely on a case that predates the existence of sections 523.253 and 523.256. In *State ex rel. Missouri Highway & Transportation Commission v. Anderson,* 735 S.W.2d 350, 351–52 (Mo. banc 1987), the Supreme Court of Missouri made absolute a writ of prohibition that prevented the trial court from permitting discovery on the condemning authority's appraisals. The Court held that "the relationship between the market value of the property and the offer is not of material significance in determining the existence of the good faith negotiations *required by § 523.010 and Rule 86.04." Id.* at 354

(emphasis added). The Court noted further that "the niceties of the manner in which an appraiser arrived at his appraisal, and perhaps even the appraisal itself, have no real significance at the initial hearing." *Id.*

However, the proceedings in *Anderson* concerned the condemning authority's alleged failure to meet the requirements of section 523.010 and Rule 86.04; it was not a proceeding under section 523.253 or section 523.256. *Id.* at 352–53. Indeed, *Anderson* was decided almost twenty years before sections 523.253 and 523.256 were enacted, and thus it did not concern the good faith requirements of these sections. Section 523.010 and Rule 86.04 require only that the petition state that the condemning authority and the landowner could not agree on a purchase price or alternatively that the landowner lacks capacity to contract or cannot be found. Courts have interpreted section 523.010 and Rule 86.04 to require a "good faith negotiation" before condemnation proceedings can continue, *id.* at 354; *State ex rel. Mo. Highway & Transp. Comm'n v. Rantz*, 43 S.W.3d 436, 440 (Mo.App. S.D. 2001); however, prior to the 2006 amendments, "good faith negotiations" did not presuppose, as sections 523.253 and 523.256 now require, the landowner's receipt of an appraisal "made using generally accepted appraisal practices" or an "explanation with supporting financial data for its determination of the value." *See Anderson*, 735 S.W.2d at 354. Since *Anderson* was decided before sections 523.253 and 523.256 were enacted, it does not stand for any proposition relevant to the good faith requirement of those sec-

tions, vis-à-vis generally accepted appraisal practices.

The Expansion Authority argues that the 2006 amendments to chapter 523 do not affect a condemning authority's requirement to negotiate in good faith. We disagree. The legislature enacted the 2006 amendments to chapter 523 in response to *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), which held that it did not violate the United States Constitution when private property was taken and given to another private entity for public development purposes even when the property was not located in a blighted area. Dale A. Whitman, *Eminent Domain Reform in Missouri: A Legislative Memoir*, 71 Mo. L.Rev. 721, 723 (Summer 2006). Thus, the legislature's aim was to *strengthen* the rights of landowners in eminent domain actions. *Id.* The precise language at issue here—the requirement that any appraisal be conducted using generally accepted appraisal practices—was inserted "to prevent condemnors from providing the landowner with slipshod or incompetent appraisals." *Id.* at 749.[2]

Thus, section 523.253 gave landowners the *added* protections that an appraisal (or an explanation with supporting financial data) be included in the condemning party's good faith offer and that any appraisal be made using generally accepted appraisal practices. These protections did not exist at the time the Court decided *Anderson.*

In arguing that the circuit court exceeded its authority in considering the cross-examinations of the appraisers, the Expan-

**2.** We also reject the Expansion Authority's characterization at argument of sections 523.253 and 523.256 as creating a "safe harbor" for condemning authorities. The implication of this argument is that these statutes were intended to provide protections to condemning authorities. As is set out above, we believe the intent of the General Assembly in enacting these provisions was to protect property owners, not condemning authorities.

sion Authority cites *Waite*, a post–2006 amendment case, for the following:

> Our inquiry into the City's "good faith" is limited to the following questions: Did the City give Seller the required notices? Did the City make an offer that was not less than the amount reflected in its appraisal? Did Seller have an opportunity to obtain her own appraisal? Did the City consider alternate locations that may have been suggested by Seller? If the answer to these questions is yes, the City has met the statutory requirements of good faith negotiation as expressly defined under Section 523.256.

280 S.W.3d at 778.

However, the Expansion Authority cites *Waite* out of context. In *Waite*, the Eastern District of this court stressed that its analysis of good faith under section 523.256 *presupposed* compliance with section 523.253.

> Incorporated into the statutory requirements for good faith negotiation is the prerequisite that an "offer" pursuant to Section 523.253 has been extended to Seller. Only if the offer mandated by Section 523.253 has been given to Seller do we consider whether the condemning authority engaged in good faith negotiations under Section 523.256.... Were the trial court correct in its assessment of the Purchase Agreement, we would affirm its Judgment under Section 523.253 and need not undertake any analysis of whether the City engaged in "good faith negotiation."

*Id.* at 778–79. Of course, an "offer" under section 523.253 does not pass muster if the appraisal included with it was not made using "generally accepted appraisal practices." As such, before the circuit court addresses the limited questions noted in *Waite* (compliance with section 523.256), it must first address the threshold question of whether the requirements of section 523.253 were met, *see id.*, and, from the 2006 amendments onward, that issue necessarily includes an inquiry into whether any included appraisal was made using "generally accepted appraisal practices." [3] § 523.253.2(2).

Thus, contrary to the Expansion Authority's argument, the circuit court did not exceed its authority in considering the cross-examination of the appraisers on the limited issue of the credibility of their claim that they used generally accepted appraisal practices.

We stress that section 523.253 does not contemplate a full determination of the fair market value of the subject property at the initial hearing. A condemning authority need only show that its appraisal was made by a state-licensed appraiser who used generally accepted appraisal practices. However, contrary to the implications of the Expansion Authority's argument, the circuit court is not required to take the appraisers' testimony at face value, without any further inquiry as to whether generally accepted appraisal practices were in fact used. Blind acceptance of an appraiser's testimony would render sections 523.256 and 523.253 meaningless and would permit the condemning authority to provide landowners with "slipshod or incompetent appraisals," the precise evil the legislature sought to avoid in enacting section 523.253. Whitman, 71 Mo. L.Rev. at 749.

Accordingly, the trial court did not ex-

---

**3.** The Expansion Authority could have complied with section 523.253 by providing an "explanation with supporting financial data for its determination of the value." However, it chose to include an appraisal with its offer, and therefore it was bound to comply with section 523.253.2(2).

ceed its authority. Point denied.[4]

### 3. Attorneys' fees

█ The Expansion Authority further argues that the circuit court erred in finding that Brown–Caldwell, as the owner and holder of a note secured by a deed of trust upon Ivanhoe Gardens, was "an owner" of Ivanhoe Gardens for purposes of awarding attorneys' fees under section 523.256. We disagree.

Section 523.256 provides:

If the court does not find that good faith negotiations have occurred, the court shall dismiss the condemnation petition, without prejudice, and shall order the condemning authority to *reimburse the owner* for his or her actual reasonable attorneys' fees and costs incurred with respect to the condemnation proceeding which has been dismissed.

(Emphasis added.)

█ For the purposes of eminent domain, the owner and holder of a note secured by a deed of trust upon the subject property is an "owner" of the property. *Morgan v. Willman*, 318 Mo. 151, 1 S.W.2d 193, 200 (1927). "A mortgagee with a security interest in real estate may have a right to compensation if the mortgaged property is taken or damaged for public use because the mortgagee's interest in real estate is considered 'property.'" *Barket v. City of St. Louis*, 903 S.W.2d 269, 271 (Mo.App. E.D.1995).

Since the owner and holder of a note secured by a deed of trust upon property to be condemned qualifies as an "owner" of that property, *Morgan*, 1 S.W.2d at 200; *Barket*, 903 S.W.2d at 271, Brown–Caldwell was entitled to attorneys' fees pursuant to section 523.256. Point denied.

In addition, we grant Respondents' motions for appellate attorneys' fees.[5] When the legislature has provided for an award of attorneys' fees, it would be inconsistent with legislative intent for us to deny attorneys' fees on appeal. *Bldg. Owners & Managers Ass'n v. City of Kansas City*, 231 S.W.3d 208, 214 (Mo.App. W.D.2007). Accordingly, we remand to the circuit court for the determination of a proper award of appellate attorneys' fees.

For the reasons stated above, we affirm the circuit court's judgment and remand for a determination of appropriate appellate attorneys' fees.

JAMES EDWARD WELSH, Presiding Judge, and MARK D. PFEIFFER, Judge, concur.

---

4. Since the lack of good faith negotiations is an independent basis to affirm the judgment, we need not decide whether Ivanhoe was entitled to and received a "first option" to redevelop the property.

5. Both Brown–Caldwell and Ivanhoe filed motions pursuant to Special Rule XXIX of the Missouri Court of Appeals, Western District.